## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DAWN BOSCARINO, et al.,

      Plaintiffs,

v.                              Case No. 21-10899
                                    Hon. Denise Page Hood

THE AUTO CLUB GROUP,

      Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [#29] and GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO STRIKE REPLY BRIEF OR FOR LEAVE TO FILE A SUR-REPLY [#33]

**I.**      **INTRODUCTION**

On April 21, 2021, Plaintiffs Dawn Boscarino, Ellen Goodnoe, Michael Russell, and Cheryl Winay filed a Complaint against Defendant The Auto Club Group.  Plaintiffs allege Defendant discriminated against them in violation of: (a) Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e(b) (Count I); (b) 42 U.S.C. § 1981 (Count II); and (c) the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2010 et seq. ("ELCRA") (Count III).  Presently before the Court is a Motion for Summary Judgment filed by Defendant. ECF No. 29.  The Motion was fully briefed, and a hearing was held on October 12, 2022.  The Motion is granted.[1]

_____

[1] Plaintiffs also filed a Motion to Strike Reply Brief or for Leave to File a Sur-reply in Response to Defendant's Motion for Summary Judgment. ECF No. 33.  The

## II.    RELEVANT BACKGROUND

As of July 2021, all Plaintiffs had been employed by Defendant without issue for years (Boscarino, since 1996; Goodnoe, since 2002; Russell, since 2000; and Winay, since 2016). Plaintiffs, all of whom are Caucasian, were serving as Claims Representatives for Defendant in July-September 2020.  On July 21, 2020, Boscarino was off work when she shared a Facebook video depicting Black Lives Matter ("BLM") protestors lying in a roadway at 23 Mile Road and Van Dyke Avenue in Shelby Township, Michigan. Plaintiff Boscarino commented, "[t]his is fn nuts! These peeps need to get a life or a job. The police don't have a say anymore. Just sad. What is this world coming too? Smh." Plaintiff Russell wrote, "[b]etter idea go work at a kids shelter and be a mentor and change this vicious cycle of black violence." Plaintiff Goodnoe posted, "[s]peed bumps." Plaintiff Winay said, "[m]aybe when one of them goes 'ouch' it will get through to the others." Another employee, Maria Viviano, stated, "I know. This is crazy." ECF No. 29, Ex. J at PageID.516.  Another employee, Lynda DeFazio, commented,

---

Court finds that Plaintiffs' request that the Court strike Defendants' reply brief is without merit and denies that request.  The Court also is not persuaded that Defendant's reply brief addressed issues for the first time, except to the extent that Defendant responded to arguments made by Plaintiffs in their response to Defendant's motion for summary judgment.  In the interest of allowing Plaintiffs to fully present their arguments in writing, however, the Court granted Plaintiffs' request to file a sur-reply at the oral argument.  The Court has reviewed and considered the contents of the sur-reply in analyzing Defendant's Motion for Summary Judgment.

"What's sad is that it ever had to get to this point."  There is no dispute that none of the Plaintiffs posted at work, no Plaintiff identified himself or herself as an employee of Defendant in the comments/posts at issue, and there was nothing in Plaintiffs' posts to indicate where they were employed.

On September 3, 2020, Defendant's Vice President, Matt Michalski, received anonymous letters about the Facebook comments made by Boscarino, Goodnoe, Russell, and Winay.  The letters stated:

> Enclosed is a conversation of some of your employees expressing their disgust of African Americans protesting against racial injustice in Macomb County.  The following employees are Dawn Boscarino, Ellen Goodnoe, Michael Russell and Cheryl Winay.
>
> * * * * *
>
> Racism fosters hatred, inferiority, and economic inequality. It's hurtful and appalling that its people like your above employees continues to foster this racist behavior and participate in these injustices done to African Americans. . . .
>
> * * * * *

ECF No. 29. Ex. J.  The letters also contained pages with a screenshot of the protestors and each Plaintiffs' comments. Michalski forwarded the letters to Employee Relations Manager Alison Krumm, who was tasked with investigating the allegations in the letter, along with Employee Relations Manager Ben Cooper and Senior Employee Relations Specialist Kim Pein. ECF No. 29, PageID.363.

Defendant then conducted an investigation based upon that letter. Defendant did not investigate who authored the letter. ECF No. 31, Ex. N at 15. There were two other employees, Lynda DeFazio and Maria Viviano, who posted a comment and was listed as a "Subject of Interest" in the Investigation Report, but neither were named in the anonymous letter. Based on the Investigation Report, it appears neither was interviewed as part of the investigation. ECF No. 29-12, PageID.519-23. Defendant's Code of Conduct was not referenced in the Investigation Report. ECF No. 29-12, PageID 519-28.

The investigation began with Cooper interviewing Plaintiffs. ECF No. 29-12, PageID.519-20. He concluded in a September 17, 2020 email that he "did not get the impression at all that anyone had any ill intent or aggression against race. It appears to be in poor taste, but all involved specifically stated they were in support and the comments were not intended to be derogatory." ECF No. 31, Ex. O. All Plaintiffs were suspended with pay on September 25, 2020. ECF No. 29-13, PageID.530-33.

Employee Relations met with Christopher Gerhardt, Claims Director, to discuss the investigation's findings. (ECF No. 29, Ex. N at 23-25) Gerhardt, after consultation with Pein, made the decision to terminate the Plaintiffs on September 29, 2020. Ex. M at 23. Cooper, Pein and Gerhardt are Caucasian. ECF No. 29,

PageID 363, 365. Gerhardt knew the post depicted individuals staging a "protest connected to social justice and Black Lives Matter." Ex. M at 20.

On September 29, 2020, Defendant fired all four Plaintiffs, sending each Plaintiff a Termination Letter signed by Gerhardt, to which was attached a Termination Report. *See* ECF No. 29, Ex. N and O, respectively.  The Termination Letters indicate that each Plaintiff's suspension has been converted to a termination of employment and state that "[t]he incidents underlying your termination are provided on the enclosed Termination Report." ECF No. 29, Ex O (PageID.553-56).  The Termination Reports state that the following factors constituted the basis for termination:

A. Plaintiffs "posted comments perceived as derogatory toward African Americans on Facebook."

B. Plaintiffs "acknowledged making the posts, and the negative result of her [his] actions.

C. "In accordance with the ACG Social Media Policy, individuals have a responsibility to conduct themselves in a professional manner that does not adversely affect the ACG brand and image."

D. Each Plaintiff "exercised poor judgment in her [his] actions, and as a result of the investigation, the Company has lost faith in [Plaintiff's] ability to perform in a professional capacity."

ECF No. 29, Ex. O (PageID.558-61).  Neither the Termination Letter nor the Termination Report mentioned the Code of Conduct.

Defendant's "Social Media Policy" warns against sharing communications "that are contrary to" Defendant's Code of Conduct. ECF No. 29-4, PageID.413. Defendant also has a "Code of Conduct" that warns against using company resources to create or send "materials that are harassing;" "discrimination, harassment and retaliation in employment based on race;" and making "offensive remarks, comments, jokes, slurs directed toward an individual that directly or indirectly references a protected characteristic." ECF No. 29-3, PageID.400.

## I.   LEGAL STANDARD

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Id*.   Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).   Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.   In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.   *Celotex Corp.*, 477 U.S. at 322-23.   A court must look to the substantive law to identify which facts are material.   *Anderson*, 477 U.S. at 248.

## II.   ANALYSIS

Plaintiffs' discrimination claims under Section 1981 and ELCRA are examined under the same framework used in Title VII cases. *Noble v. Brinker Int'l, Inc.*, 391 F.3d 716, 720 (6th Cir. 2004) (Section 1981); *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004) (ELCRA); *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) (ELCRA).   The Court therefore addresses Plaintiff's Title VII, Section 1981, and ELCRA claims simultaneously.

Title VII is "not limited to discrimination against members of a particular race." *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 279 (1976). A plaintiff can prove disparate treatment either (1) by direct evidence that a workplace policy, practice, or decision relies expressly on a protected

characteristic; or (2) by using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

### A. Direct Evidence of Discrimination

Plaintiffs contend that there was direct evidence of race discrimination -- that Defendant terminated Plaintiffs because they are Caucasian. "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (remaining citations omitted)). Direct evidence "**does not require a factfinder to draw any inferences** in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Id*. (emphasis added).

Plaintiffs suggest that there is direct evidence of discrimination because: (a) they are Caucasian; (b) they were allegedly terminated because their comments were "derogatory toward African Americans;" (c) Defendants' representatives later indicated that the terminations were for race-neutral reasons; (d) Plaintiffs were not identifying themselves as employees of Defendant; (e) Cooper concluded that "the comments were not intended to be derogatory;" and/or (f) Defendant's Code of Conduct states that Defendant desired to promote "the growth of diversity and inclusion with [its] employees." *See* ECF No. 29, PageID.405.

The Court is not persuaded by Plaintiffs' argument.  They have offered no evidence that anyone associated with Defendant stated or wrote that Plaintiffs were terminated because of their race (Caucasian).  Even if Plaintiffs were terminated for making comments "derogatory toward African Americans" -- and another non-Caucasian employee was not terminated for the exact same conduct, such "facts" would not demonstrate on its face – without inference -- that Plaintiffs were terminated because they were Caucasian.  At best, those "facts" might demonstrate that Plaintiffs were terminated for making negative comments about a particular race (although it is true that a person of any race could make such comments), however, a fact finder would have to infer that Plaintiffs were terminated because they are Caucasian and the other employee was not because she is not Caucasian.

The deficiency of Plaintiffs' position regarding direct evidence of discrimination is exemplified by Plaintiffs' repeated statements in support of their direct evidence theory.  Plaintiffs state, among other things, that: (a) "Plaintiffs instead were posting comments a reasonable juror could find were innocuous and not derogatory," *id.*; (b) "[a] reasonable fact finder would not believe this purportedly race-neutral explanation for the terminations because it is contradicted by all of Defendant's contemporaneous documentation," *id.* at PageID.618; and (c) "[t]he reason we know that [the terminations would not have happened if Plaintiffs were non-Caucasian] . . . because the only non-Caucasian employee commenting

in the same Facebook post was not even interviewed, let alone terminated." *Id.* at 619.

Direct evidence of discrimination does not require a reasonable factfinder to agree with or deduce something, nor is it necessary to have a theory explained to the factfinder, as each of the statements above would require. Direct evidence only exists where there is evidence that, if believed, requires the conclusion – without inference – discrimination occurred. *See, e.g., DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004); *Tepper*, 505 F.3d at 515; *Johnson*, 319 F.3d at 865. Plaintiffs fail to cite any such evidence. The Court concludes Plaintiffs have not established a *prima facie* claim based on direct evidence of race discrimination.

**B. Indirect Evidence of Discrimination**

*1. Legal Framework*

To establish a prima facie case of race discrimination under Title VII, Section 1981, or ELCRA based upon indirect evidence, a plaintiff must show that: (1) plaintiff was a member of a protected class; (2) plaintiff suffered an adverse employment action; (3) plaintiff was qualified for the position; and (4) the adverse employment action occurred under circumstances that give rise to an inference of race discrimination. *McDonnell Douglas*, 411 U.S. at 802; *DiCarlo*, 358 F.3d at 414-15. If a plaintiff can do so, then the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the termination. Defendant's

explanation "must be clear and reasonably specific." *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 258 (1981).

Once the defendant has articulated a legitimate, non-discriminatory reason for its actions, the burden shifts back to the plaintiff to show the defendant's reason was mere pretext for unlawful discrimination. *See, e.g., Braithwaite v. The Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001). A plaintiff can establish pretext by showing: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the termination], or (3) that they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chems Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994); *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008). Defendant "cannot avoid liability just by citing some other factor that contributed to its challenged employment decision." *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1734 (2020). If race was just one cause, "that is enough to trigger the law." *Id*. at 1739.

### 2. Prima Facie Case

It is undisputed that Plaintiffs were member of a protected racial class (Caucasian) and suffered an adverse employment action (suspension and termination). Defendant perplexingly argues that Plaintiffs were not qualified for their positions, relying on the Facebook comments for which they were terminated. Those comments, however, do not indicate in any way whether Plaintiffs were

qualified for their positions, particularly as Defendant does not even argue that the comments reflect an inability to perform the qualifications required of a Claims Representative.

Plaintiffs only have to establish that they were performing their jobs at a level that was meeting "legitimate expectations." *See McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990). As each of the Plaintiffs had been working for Defendant for four years at the time of the underlying events, and Defendant has offered no evidence of disciplinary action or any deficient performance with respect to any Plaintiff, the Court finds that Plaintiffs have demonstrated that they were qualified for their positions. *See Ruiz v. County of Rockland*, 609 F.3d 486 (2nd Cir. 2010) (holding the defendant's claim of serious misconduct by the plaintiff does not bar the existence of a prima facie case when the plaintiff's performance evaluations demonstrated satisfactory work).

The Court also rejects Defendant's suggestion that racial animus is "implausible" in situations where, as here, the decisionmakers are the same race as the employees against whom adverse action is imposed. *See, e.g., Billingsley v. Jefferson County*, 953 F.2d 1351, 1353 (11th Cir.1992) (a Title VII violation may occur even where a supervisor or decision-maker is of the same race as the alleged victim). *See also Castaneda v. Partida*, 430 U.S. 482, 499 (1977) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of

law that human beings of one definable group will not discriminate against other members of their group."); EQUAL EMPL. OPPORTUNITY COMM'N, *Race and Color Discrimination* (Apr. 19, 2006) ("The race of the decisionmaker may be relevant but is not controlling. In other words, it should not be presumed that a person would not discriminate against members of his own race.").[2]

Defendant next argues that Plaintiffs cannot establish circumstances giving rise to an inference of race discrimination. As Defendant argues, the essence of a discrimination case is that "similarly situated people have been treated differently" because of their membership in a protected group. *Mitchell v. Toledo Hosp*., 964 F.2d 577, 583 (6th Cir. 1992). To show that employees are "similarly situated," Plaintiffs must show that all of the relevant aspects of their employment situation were nearly identical to those individuals to which they compare themselves. In other words, the individuals must have (1) dealt with the same supervisor, (2) been subject to the same standards, and (3) engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Id*.

---

[2] Defendant argues that the Eleventh Circuit has indicated that where a decisionmaker is of the same race as the adversely affected party, the plaintiff should present evidence that the decisionmaker "held members of his own race to a higher standard of conduct than members of another race." *United States v. Crosby*, 59 F.3d 1133, 1135 n. 4 (11th Cir. 1995). Plaintiffs, however, have not introduced any evidence that the decisionmaker(s) did so in this case.

Defendant contends that Plaintiffs have not, and cannot, identify any non-Causian employees who were not terminated for engaging in similar misconduct.[3] As it relates to "similar circumstances," Defendant states that each of Winay, Boscarino, and Russell admitted at deposition that he or she was unaware of any Claims Representative or employee of Defendant who made comments deemed to be derogatory or racially insensitive on social media, was a subject of a complaint to Defendant, and was not terminated. *See* ECF No. 29, Ex. D at 96; Ex. E at 91; Ex. F at 70, 73-74, 77; respectively.[4]

---

[3] The Court notes that, with one exception that will be discussed below, Plaintiffs have not claimed or identified any persons of a different race (non-Caucasian) who were not fired for misconduct of any nature.

[4] Defendant acknowledges that Goodnoe correctly stated at her deposition that another employee of Defendant, Lynda DeFazio, commented on the Facebook post but was not terminated. ECF No. 29, Ex. G at 58-60. DeFazio's comment was not identified as offensive in a complaint that was sent to Defendant. The Court does not find it odd that DeFazio's name or comment was not included in the complainant's letter because DeFazio wrote, "What's sad is that it ever had to get to this point." That statement is not derogatory toward any persons or activity depicted in the Facebook post.

Defendant also notes that DeFazio is Caucasian, so she would not be a comparator to help Plaintiffs' position. *See, e.g., Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363-364 (6th Cir. 2010) (holding that plaintiff had not established prima face case where plaintiff failed to identify a similarly-situated employee outside of the protected class who received more favorable treatment). Plaintiff does not challenge any of Defendant's contentions *vis a vis* DeFazion, nor do they respond to this argument in their response brief. For the reasons set forth above, in particular that DeFazio is Caucasian, the Court agrees that DeFazio is not a comparator that helps establish a *prima facie* case of race discrimination.

Plaintiffs assert that there are two "easy" comparators.  Plaintiffs first cite Maria Viviano, who indisputably was employed by Defendant when the Facebook posts were made.  Plaintiffs claim that Viviano engaged in the same conduct as Plaintiffs, but state that Defendant did not interview, suspend, or terminate her. Plaintiffs concede that Viviano may identify as "Caucasian," but maintains that, as an Hispanic, she is of "a distinct race." Citing *Village of Freeport v. Barrella*, 814 F.3d 594, 606 (2d Cir. 2016) ("Hispanics comprise a distinct race."); *Saint Francis College v. Al-Khazraji*, 481 U.S. 604 (1987) (a plaintiff "born an Arab" can be discriminated against based on race under Section 1981, even though "under current racial classifications Arabs are Caucasians").

Defendant counters that: (a) Cooper declared that company records reflect that Viviano (and DeFazio) are Caucasian, ECF No. 29-10, PageID.489; and (b) the only other "evidence" in the record regarding Viviano's race is Goodnoe's speculation at her deposition that she believed, based on talking with her, a female with "long dark curly hair" (Goodnoe did not know the woman's name, though it became clear to the parties that she meant Viviano) was "Italian, Hispanic." ECF No. 29-8, PageID.464. The Court finds that this evidence is not sufficient to identify Viviano as a comparator who is outside of Plaintiffs' protected characteristic (being of the Caucasian race).[5]

---

[5] First, even if Viviano is Hispanic, that does not mean she is outside the protected class because Hispanic may be considered Caucasian.  Second, even if Hispanic

Plaintiffs also maintain that another Caucasian employee, Tamara Headley, also was let go "under similar circumstances on June 11, 2020." ECF No. 31, PageID.623. The Court agrees that Headley's termination was the result of similar activity to that for which Plaintiffs were suspended and terminated. Headley was terminated after posting an image "with a black substance on her face" with the caption, "I just love my new nighttime regimen. It's doing wonders for my skin." ECF No. 29, PageID.585. Headley then was terminated because the image was "derogatory toward African Americans." *Id.* This evidence, however, does not constitute a valid comparator. It simply shows another Caucasian employee who allegedly was terminated for engaging in essentially the same conduct as Plaintiffs – making a post on Facebook that Defendant considered "derogatory toward African Americans."

For these reasons, even if the "was a subject of a complaint to Defendant" criteria Defendant suggested is removed, Plaintiffs have not identified any person outside of the protected class (Caucasian) who was treated more fairly than the way the way Plaintiffs were treated.

Plaintiffs also contend that there is circumstantial evidence of race discrimination against them by Defendant based on: (1) one of Defendant's goals

---

were treated as outside the protected class (breaking Caucasian into Hispanic and non-Hispanic subgroups), the fact that Viviano was not identified in the complainant's letter to Defendant undermines Plaintiff's reliance on Viviano as a comparator.

expressed in the Code of Conduct (the desire for "growth of diversity and inclusion with our employees;" and (2) the fact that Plaintiffs were terminated shortly after Defendant announced on June 10, 2020 its commitment to diversity and inclusion and the development of "a new division . . . solely dedicated to promoting racial equity and equality."

The Court fails to see expressing a desire to expand diversity and inclusion of employees and developing a new division "solely dedicated to promoting racial equity and equality" constitutes any evidence of race discrimination.  If Plaintiffs are suggesting they were terminated so that persons of a different race, *i.e.,* non-Caucasian, could be hired, Plaintiffs have failed to allege, to say nothing of offer evidence, that Defendant replaced them with any persons who are non-Caucasian.

For the reasons stated, the Court concludes that Plaintiffs have failed to produce sufficient evidence to establish a *prima facie* case of race discrimination.

### 3.  Legitimate, Non-Discriminatory Reason for Termination

Even if Plaintiffs could establish a *prima facie* case of race discrimination, the Court finds that Defendant offered a legitimate, non-discriminatory reason for terminating Plaintiffs in the Termination Letters and attached Termination Reports sent to Plaintiffs. ECF No. 29, Ex. N and O, respectively.  The Termination Letters notify each Plaintiff that her/his suspension has been converted to a termination of employment and state that "[t]he incidents underlying your termination are

provided on the enclosed Termination Report." *See* ECF No. 29, Ex O (PageID.553-56).   As noted above, the Termination Reports identified the following four factors Defendant's basis for termination each Plaintiff:

> A. Plaintiff "posted comments perceived as derogatory toward African Americans on Facebook."
>
> B. Plaintiff "acknowledged making the posts, and the negative result of her [his] actions.
>
> C. "In accordance with the ACG Social Media Policy, individuals have a responsibility to conduct themselves in a professional manner that does not adversely affect the ACG brand and image."
>
> D. Plaintiff "exercised poor judgment in her [his] actions, and as a result of the investigation, the Company has lost faith in [Plaintiff's] ability to perform in a professional capacity."

ECF No. 29, Ex. P (PageID.558-61).   There is nothing on the face of the Termination Letters or the Termination Reports that mentions or alludes to Plaintiffs' race (or relies on any other illegal basis).   Accordingly, the Court finds that Defendant has satisfied its burden for offering a legitimate, non-discriminatory reason for termination.

### 4.   *Pretext*

Plaintiff contends that Defendant's proffered reason is mere pretext for discrimination for several reasons, including that: (a) it was only after Defendant was sued for race discrimination that it offered a race-neutral reason for termination; (b) a Hispanic employee (Maria Viviano) who also commented on the

Facebook video was not terminated (or even investigated); (c) Defendant's claim that the comments were derogatory toward African-Americans; (d) Defendant's admission that the race of persons involved in an event is a factor when there is a claim of discrimination; (e) Vice President Brian Pozzi upheld Plaintiffs' terminations on appeal based on "growth of diversity and inclusion;" and (f) Defendant supported the BLM movement, "including monetary donations and the BLM mural on its building." The Court concludes that Plaintiffs' arguments on pretext are not supported by sufficient evidence to withstand summary judgment.

As noted above, the initial reasons Defendant gave for termination, as set forth in the Termination Letters/Termination Reports, were race neutral. Plaintiffs then suggests that Defendant's decisionmakers lost all credibility when claiming at depositions that Plaintiffs' terminations were entirely race neutral. Plaintiff cite Gerhardt's testimony upon being asked the following question: "[I]f the Facebook posts were your employees, right, employees of ACG, being critical of white supremacists protesting, that you would not have fired plaintiffs, isn't that correct?" ECF No. 31-13, PageID.728. In response, Gerhardt testified:

> Yeah, no, and what I would say there is if the plaintiffs had taken any action advocating for – using nonviolent protesters exercising their first amendment right as a, quote, speed bump, things of that nature, the nature of whatever the protest was tied to, the ultimate decision to terminate, that is an aside.
>
> That didn't factor into whether it was a Black Lives Matter protest, whether it was a Proud Boys demonstration or whether it was

just people out there protesting a local business, something like that.
That is not the crux of the issue.  The racial component is not the crux
of the issue.

*Id.* at 728-29.  Plaintiffs contend this statement, as well as Pozzi's statement that he

did not know the race or ethnicities of Plaintiffs, is not credible.

Even if the Court were to find Gerhardt's or Pozzi's comments not credible

(which it cannot do on summary judgment, as that is a question for the factfinder),

the reliance on those statements exemplifies how Plaintiffs' focus in this case is

misplaced.  Plaintiffs consistently base their claims on the "race" they associate

with the underlying activity – African Americans and/or the BLM movement.  But,

the underlying activity, in itself – about which a private company such as

Defendant has the right to support, condemn, or take no position at all -- does not

bear on whether Defendant terminated Plaintiffs based on **Plaintiffs'** race.

Plaintiff argues, without citing to any evidence to support their argument,

that Defendant made "monetary donations [in support of the BLM movement] and

[put] the BLM mural on its building." ECF No. 31, PageID.625.  In fact, the

evidence in the record shows that Defendant committed an initial $1,000,000

investment to create and develop programs aimed at improving social justice and

equality in the communities Defendant serves, specifically in the areas of

bias/cultural awareness and diversity. *See* ECF No. 31-11, PageID.721. Even if

Defendant does contribute to or support the BLM movement, such contributions

and support would not demonstrate that Defendant terminated Plaintiffs because they are Caucasian.  That type of support may constitute evidence that Plaintiffs were terminated for their conduct that Defendant deemed "derogatory" or offensive to African Americans or the BLM movement.

The Court finds instructive Plaintiffs' argument rejecting Defendant's suggestion that it is "implausible" that a Caucasian supervisor could discriminate against a Caucasian employee. *Supra*.  Based on the same reasoning, and perhaps it goes without saying, that a non-Caucasian (specifically, an African American) employee could post comments that were "derogatory" or offensive to non-Caucasians (specifically, African Americans) or the BLM movement.[6]  Plaintiffs have offered no evidence – direct or circumstantial -- that Defendant would not have terminated a non-Caucasian person for posting the same comments about the BLM movement (or African Americans, to use Defendant's words) for which Plaintiffs were terminated.

Plaintiffs next contend that the only other persons terminated for social media postings were a small group of persons who performed derogatory acts while wearing company branded clothing and/or, like Plaintiffs, made comments that were perceived to be offensive to African Americans.  Again, what is offensive

---

[6] Similarly, the Court notes that a Caucasian employee could say something derogatory or offensive about a Caucasian individual, Caucasians generally, or a movement that is "identified with" Caucasians (*e.g.* Proud Boys or white supremacists).

to a particular group is not evidence that Defendant based any adverse decision on the race of the employee who engaged in the allegedly offensive conduct.

Plaintiffs note that, in addition to themselves and Headley, other persons terminated by Defendant for violating Defendant's social media policy: (a) had posts clearly identifying the company (Service Vehicle Operator Carnell Gordon, who posed with guns while in uniform and posted live videos while in a truck with the "AAA" brand and posted images of himself in a AAA uniform that included negative comments about Chicago police, and Service Vehicle Operator Andrew Nekuda, who posted a Facebook live video while driving past the scene of an accident in a uniform and vehicle that each included, "AAA" brand); or (b) made a recording during work of live conversations with customers about whom the employee made negative remarks (Insurance Sales Agent Monique Dorsey). Although those circumstances may show that there was a more obvious public link between the employee and the fact that the employee worked for Defendant, such a discrepancy does not support Plaintiff's contention that Defendant's proffered reason for terminating them was pretext for race discrimination (and, for that matter, such evidence does not aid their burden to establish a *prima facie* case).

Plaintiffs assert that Defendant's proffered reason of "harm to reputation" also "reeks of pretext." ECF No. 31, PageID.625. The Court agrees with Plaintiffs that two cases cited by Defendants are inapplicable. *See Kinoshita v. Canadian-*

*Pacific Airlines, Ltd.*, 803 F.2d 471 (9th Cir. 1986), and *Wheat v. Chase Bank*, 2014 WL 457588, No. 3:11- cv-309 (S.D. Ohio Feb. 3, 2014).  As Plaintiffs assert, the plaintiffs in those cases were arrested for serious criminal activity, not social media postings that were derogatory, which is not comparable.

The Court, however, is not persuaded by Plaintiffs' claim that Defendant's "harm to reputation" basis for termination was pretextual because there was "nothing in the posts" themselves to indicate Plaintiffs worked for Defendant.  The deficiency of this argument is exposed by the complainant's letter to Defendant that prompted Defendant's investigation of the Facebook posts.  The author of the letter: (a) identified all four Plaintiffs as employees of Defendant as persons "expressing their disgust of African Americans;" (b) asserted that Plaintiffs "work for ACG and should represent the values of ACG" [the values of ACG were cited to be: "ACG respects the human rights and dignity of all people throughout their organization" and "Do the right thing"]; and (c) contended that "[i]t's hurtful and appalling that its people like your above employees continue to foster this racist behavior an participate in these injustices done to African Americans." ECF 29, Ex. J.

Plaintiffs maintain that the other reason Defendant proffered, "violation of policy," also is pretextual because it is not "clear and reasonably specific." *Burdine*, 450 U.S. at 258.  Plaintiffs suggest it is not plausible that they were

terminated for "offensive remarks, comments, jokes, slurs directed toward an individual that directly or indirectly references a protected characteristic" prohibited by the Code of Conduct.  They contend that reason was never referenced in the Investigation Report, the Termination Reports, or in Defendant's responses to Plaintiffs' appeals to Pozzi.  Plaintiffs state that, to the contrary, (1) Cooper concluded after interviewing them that he "did not get the impression at all that anyone had any ill intent or aggression against race or the BLM movement.  It appears to be in poor taste, but all involved specifically stated they were in support and the comments were not intended to be derogatory," ECF No. 31, Ex. O; and (2) Defendant's Rule 30(b)(6) witness responded to a question of what was prohibited by testifying "I mean you would have to read the policy.  The policy will state what we don't want employees doing on social media.  I don't have the policy memorized." ECF No. 31, Ex. J at 26-27.

Although Cooper opined that there was no "ill intent or aggression [by any Plaintiff] against race or the BLM movement," this statement again fails to bear on Plaintiffs' race.  Cooper is merely offering his belief regarding Plaintiffs' attitudes and comments about the BLM movement or race (African Americans). The Court also is not persuaded that the Rule 30(b)(6) witness's failure to memorize the policy or know what part of a policy Plaintiffs violated constitutes evidence that Defendant's alleged "violation of policy" basis for termination was pretext for

24

racial discrimination.   The witness simply said the policy would provide what employees are not to do on social media.   Neither the question or answer pertained to, or can be interpreted as bearing on, the race of Plaintiffs.[7]   Likewise, Plaintiffs stretch too far in relying on the Rule 30(b)(6) witness's statement that Defendant "takes into consideration the race of the people involved" whenever there is a "claim of discrimination." ECF No.31, Ex. J at 58.   If there is a claim of race discrimination, the race of the persons involved has to be considered; it does not show that Defendant (or any of its representatives) discriminated against Plaintiffs because they are Caucasian.

---

[7] The parties discuss *Morris v. City of Columbia*, 2019 WL 2093312 (D.S.C. June 10, 2019), where the plaintiff and other white firefighters were terminated for Facebook posts similar to those made by Plaintiffs, with the basis being that the comments were "part of a threatening statement to the lives and citizens we protect." *Id.* at *3.  In that case, there was evidence that black firefighters in the same department also made comments that could be considered similarly threatening (including one that when you protest in the street "you're just pretending to be a speed bump") were not terminated. *Id.* at *4.  Ultimately, that court concluded:

> Here, the plaintiff has presented evidence that both he and two other white firemen, Mr. Augustyn and Mr. Proctor, were terminated from employment by the defendant for social media posts that were similar to posts made by similarly situated black firemen who were not terminated from employment. The plaintiff's evidence is sufficient to create an issue of fact as to whether the defendant's reason for terminating the plaintiff was pretext for race discrimination. Accordingly, summary judgment should be denied on the plaintiff's Title VII race discrimination cause of action.

*Id.* at 9.   As *Morris* involved clear comparators, the Court finds that it only serves to buttress the Court's disposition of this case.

In conclusion, the Court notes that Plaintiffs have argued that the propriety of the terminations turns on whether Defendant "would not have terminated" Plaintiffs had they been of a different race but everything else "had been the same." Citing Seventh Circuit Pattern Civil Jury Instructions No. 3.01; *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019) (explaining that in race discrimination suits under Title VII, the question is whether a reasonable juror could conclude that the plaintiff would have kept her job if he or she had a different ethnicity, and everything else had remained the same"); *Lauth v. Covance, Inc.*, 863 F.3d 708, 715 (7th Cir. 2017) ("the proper inquiry . . . is whether a reasonable jury could determine, based on all of the record evidence," that a protected characteristic "was a cause of the plaintiff's termination"). For the reasons stated above, the Court, viewing the evidence in the light most favorable to the Plaintiffs, concludes that a reasonable juror could not conclude that had Plaintiffs been of a different race, there would have been a different result.

## I.   CONCLUSION

For the reasons stated above,

IT IS ORDERED that Defendant's Motion for Summary Judgment [ECF No. 29] is GRANTED. Judgment shall be entered separately.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Strike Reply Brief or for Leave to File a Sur-reply in Response to Defendant's Motion for Summary Judgment [ECF No. 33] is GRANTED IN PART (as to the request to file a Sur-Reply) and DENIED IN PART (as to the request to strike Defendant's reply brief).

Dated: April 28, 2023                    s/Denise Page Hood
                                         DENISE PAGE HOOD
                                         UNITED STATES DISTRICT JUDGE